**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**

| | |
|---|---|
| **THE ELEVANCE HEALTH COMPANIES, INC., ELEVANCE HEALTH, INC., CARELONRX, INC., and BIOPLUS SPECIALTY PHARMACY SERVICES, LLC,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**SENDERRA RX PARTNERS, LLC d/b/a SENDERRA SPECIALTY PHARMACY, DEREK ORMOND, and ERIC MITCHELL,**<br><br>**Defendants.** | **Case No.:** |

# VERIFIED COMPLAINT

Plaintiffs Elevance Health, Inc., The Elevance Health Companies, Inc. ("TEHC"), CarelonRX, Inc. ("Carelon"), BioPlus Specialty Pharmacy Services, LLC ("BioPlus") (collectively "Elevance Health") by counsel, hereby state the following as their Complaint against Senderra RX Partners, LLC d/b/a Senderra Specialty Pharmacy ("Senderra"), Derek Ormond ("Ormond") and Eric Mitchell ("Mitchell").

## PRELIMINARY STATEMENT

Elevance Health brings this action to halt an unlawful scheme orchestrated by its competitor, Senderra, and several former Elevance Health employees. While still employed by Elevance Health—and continuing after their departures—these employees conspired with Senderra to target Elevance Health's 340B specialty pharmacy business, BioPlus. Defendants raided BioPlus's workforce, diverted its customers, and misappropriated its confidential and proprietary information, all in flagrant violation of their contractual, fiduciary, and statutory duties, and well beyond the bounds of lawful competition.

In February 2026, Ormond, then Director of BioPlus's 340B program, gave notice that he would resign effective April 24, 2026. Ormond assured Elevance Health that he did not intend to join a competitor. That assurance was false. Within days of his departure, Ormond joined Senderra, a direct competitor of BioPlus. In rapid succession, five of Ormond's direct reports followed him to Senderra. The coordinated exodus—facilitated, upon information and belief, by Ormond's direct solicitation—severely disrupted BioPlus's operations and damaged its goodwill in the marketplace.

The employee raid was only one component of Defendants' scheme. In June 2026, while investigating the circumstances surrounding the coordinated departures, Elevance Health discovered that Ormond and Mitchell had conspired with Senderra to divert BioPlus customers even before leaving Elevance Health. Several of BioPlus's largest customers—collectively generating tens of millions of dollars in profit—had submitted new registrations in the OPAIS 340B database designating Senderra as their new "contract pharmacy representative." The registrations were clustered in early April 2026, weeks before Ormond and Mitchell resigned.

The timing and content of those registrations leave little doubt as to what occurred. One early-April registration identified Ormond by name as Senderra's contract pharmacy representative—even though Ormond was still employed by Elevance Health. Ormond and Mitchell personally managed the affected customers on BioPlus's behalf, and those customers had no prior 340B business relationship with Senderra.

Ormond and Mitchell's disregard of their duties to Elevance Health extended further. Elevance Health discovered that Mitchell was simultaneously employed by Senderra and BioPlus during at least May

and June 2026, and potentially longer. Elevance Health also discovered that Mitchell had emailed BioPlus's proprietary information to himself. That information could be—and, upon information and belief, was—used to place BioPlus at a competitive disadvantage and advance Senderra's unlawful scheme.

Defendants' misconduct continues. Senderra knowingly induced Ormond to breach the post-employment noncompetition, customer non-solicitation, and employee non-solicitation provisions of his Restricted Stock Unit Award Agreement with Elevance Health (the "Agreement"). Since Ormond and Mitchell joined Senderra, numerous BioPlus 340B customers have begun doing business with Senderra. The registrations submitted in April 2026 became active after a 60-day regulatory waiting period. As a result, since at least July 1, 2026, Elevance Health has continued to lose substantial business to Senderra through Defendants' unlawful conduct.

Elevance Health attempted to resolve this dispute without litigation and engaged in negotiations with Senderra toward an amicable resolution. Senderra nevertheless continued its unfair competition. On August 26, 2026, a representative of one of BioPlus's largest customers

("Customer A") instructed BioPlus to cancel prescriptions for Tyenne Auto Injectors so that the prescriptions could be rerouted to Senderra. Customer A's representative further disclosed that Senderra had reserved an inventory of Tyenne Auto Injectors specifically for Customer A.

This latest evidence confirms that Defendants' scheme remains ongoing and that Elevance Health's injuries will continue absent immediate judicial intervention. Elevance Health therefore seeks preliminary and permanent injunctive relief, monetary damages, and all other relief necessary to stop Defendants' unlawful conduct and remedy the harm they have caused.

## PARTIES

1. Plaintiff Elevance Health, Inc., is an Indiana corporation, with its principal place of business in Indianapolis, Indiana. Elevance Health is in the business of offering health insurance plans and services, including medical, pharmaceutical, dental, behavioral health, long-term care, and disability plans.

2. Plaintiff The Elevance Health Companies, Inc. ("TEHC") is an Indiana corporation, with its principal place of business in Indianapolis,

Indiana. TEHC is a wholly owned subsidiary of Elevance Health and was the employer of record for Mitchell and Ormond while they worked for the BioPlus 340B program.

3. Plaintiff CarelonRX, Inc. ("Carelon"), is an Indiana corporation, incorporated in Indiana, with its principal place of business in Indianapolis, Indiana. Carelon is wholly owned by Carelon, Inc., which is wholly owned by Elevance Health, Inc. Plaintiff BioPlus Specialty Pharmacy Services, LLC ("BioPlus"), is a limited liability company based in Altamonte Springs, Florida. BioPlus is wholly owned by BioPlus Parent, LLC, which is wholly owned by ATH Holding Company, LLC, which is wholly owned by Elevance Health, Inc. Because an LLC is a citizen of each state of which its members are citizens, BioPlus is a citizen of Indiana through its sole member, BioPlus Parent, LLC, which is a citizen of Indiana through its sole member, ATH Holding Company, LLC, which is a citizen of Indiana through its sole member, Elevance Health, Inc., an Indiana corporation with its principal place of business in Indianapolis, Indiana. Accordingly, BioPlus is a citizen of Indiana for purposes of 28 U.S.C. § 1332(a)(1).

4. Defendant Senderra is a specialty pharmacy company with its principal place of business at 9330 LBJ Freeway, Suite 1300, Dallas, Texas 75243. Senderra conducts business throughout the United States, including in the Middle District of Florida, and is a direct competitor of BioPlus in the 340B Drug Pricing Program market.

5. Upon information and belief, Defendant Ormond is a citizen of the State of Florida, and is a resident of Trinity, Florida. Elevance Health employed Ormond from 2020 until he resigned on April 24, 2026. Ormond is a current employee of Senderra.

6. Upon information and belief, Defendant Mitchell is a citizen of the State of Ohio, and is a resident of Plain City, Ohio. Elevance Health employed Mitchell from 2023 until he resigned on June 18, 2026.

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction over this dispute under 28 U.S.C. § 1331 with respect to Elevance Health's claims arising under the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq*.

8. This Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000.

9. In the alternative to paragraph 8, this Court has supplemental jurisdiction over Elevance Health's state law claims pursuant to 28 U.S.C. § 1367, as those claims arise from the same case or controversy as the federal claims.

10. This Court has personal jurisdiction over Ormond because he resides in Florida and is subject to general personal jurisdiction in this state.

11. This Court has personal jurisdiction over Mitchell pursuant to Florida's long arm statute, Fla. Stat. § 48.193(1)(a)(2), as a co-conspirator with Ormond, who conspired to commit tortious conduct against Elevance Health and BioPlus in Florida.

12. This Court has personal jurisdiction over Senderra pursuant to Florida's long arm statute, Fla. Stat. § 48.193(1)(a)(1)-(2), because it operates its business in Florida and committed tortious conduct against Elevance Health and BioPlus in Florida.

13. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (2) because Ormond resides in this judicial district and a substantial part of the events giving rise to the claim occurred here.

## FACTS

14. Elevance Health is a market leading health care company that offers a range of health plans and insurance benefits, including but not limited to, network-based managed care risk-based plans to the Individual, Employer Group, Medicaid and Medicare markets, level-funded health plans, and third-party administrative services.

15. Elevance Health, through its subsidiaries CarelonRX and BioPlus, also operates a operates a 340B program through which it provides contract pharmacy and program administration services to covered entities eligible under the federal 340B Drug Pricing Program.

### A. The BioPlus 340B Discount Drug Program.

16. The 340B Drug Pricing Program ("340B Program") is a federal drug discount program administered by the Health Resources and Services Administration ("HRSA") that requires pharmaceutical manufacturers to provide discounts on outpatient drugs to certain qualifying covered entities, including hospitals, health centers, and other safety-net providers. Pharmacy benefit managers such as Elevance Health administer the 340B Program on behalf of covered entities,

providing services such as contract pharmacy administration, claims processing, and revenue optimization.

17. BioPlus's 340B Program is a profitable and strategically important division of Elevance Health's business. It provides a critical service of facilitating prescription drugs for patients. It has generated millions of dollars in annual profit and serves a large and established base of hospital systems throughout the United States.

18. Elevance Health has invested substantial resources in developing its 340B Program business, including by developing proprietary pricing strategies, discount structures, operational processes for prescription drug order fulfillment, customer lists, and other confidential business information that are not generally known to competitors and helps Elevance Health distinguish itself in the marketplace (collectively, "Confidential Information" or "Trade Secrets").

19. Moreover, BioPlus's 340B Program customer relationships have been developed over the course of several years through direct, personal engagement by Elevance Health employees.

**B. Ormond's Employment with Elevance Health.**

20. Ormond worked as the head of Elevance Health's BioPlus program, holding the position of Director of CarelonRX's 340B Program Management and Sales, beginning in 2020. This was a senior leadership role and Ormond held broad discretion and authority over the entire 340B Program.

21. Ormond had direct responsibility for all 340B Program customer relationships and had exclusive access to Elevance Health's proprietary pricing structures, discount programs, customer lists, customer targets, and business strategies, and customer relationship data relating to the 340B Program.

22. Ormond's position was also directly customer-facing. He was directly responsible for developing, managing, and maintaining BioPlus's customer relationships throughout its 340B Program, and served as the primary embodiment of BioPlus's goodwill in the marketplace.

23. Ormond was also chiefly responsible for all personnel decisions within the 340B Program, including the authority to hire and fire all 340B Program employees, set employee compensation, and manage all members of the 340B Program team. As the Director, Ormond

was the direct supervisor for the entire 340B Program team, including Eric Mitchell.

24. Ormond had fiduciary duties to Elevance Health arising from his position of trust and confidence within the Company and his access to its most sensitive competitive information.

**C. Mitchell's Employment at Elevance Health.**

25. Eric Mitchell was employed by Elevance Health as a member of the BioPlus 340B team, wherein he worked as a National Contracts Executive.

26. In this executive role, Mitchell held broad responsibility for BioPlus's customer relationships. Mitchell was responsible for, among other things, establishing strategic partnerships, maintaining customer relationships, conducting sales, and developing sales presentations for customers.

27. Mitchell's role required him to have access to Elevance Health's Confidential Information, including but not limited to customer lists, customer registration information, and other proprietary data relating to the 340B Program.

28. Mitchell assumed fiduciary duties to Elevance Health as a result of his position within the Company and due to the Confidential Information he had access to during his employment.

### D. Defendants Conspire to Steal Customers, Employees, and Confidential Information From BioPlus's 340B Program.

29. On February 19, 2026, Ormond informed his direct supervisor, Chief Industry and Trade Relations Officer Mike Moyano, of his intention to resign from Elevance Health. Ormond cited burnout and team issues as reasons for his departure.

30. Ormond told Moyano and other Elevance Health employees, on multiple occasions, that he was not leaving Elevance Health to work for a competitor.

31. On or about April 24, 2026, Ormond's resignation became effective and his employment with Elevance Health officially ended.

32. On April 24, 2026, Elevance Health sent Ormond a routine letter reminding him of his post-employment obligations to Elevance Health, including the restrictive covenants contained in the Agreements.

a. <u>Ormond Causes an *En Masse* Resignation of BioPlus Employees Who Joined Him at Senderra.</u>

33. Following Ormond's resignation, Elevance Health began to notice a pattern of BioPlus employees suddenly giving notice of their resignation in rapid succession. These employees—including Eric Mitchell, Casey Miller, Anthony Mechas, Rachael Hoover, and Justin Bonewit—all reported directly to Ormond.

34. As discussed further below, Ormond violated his contractual agreement with Elevance Health, and also his fiduciary duties, by and through soliciting the following individuals to work at Senderra (collectively the "Solicited Employees"):

a. Anthony Mechas, former BioPlus "Business Information Analyst, Sr." who resigned effective April 24, 2026, to work at Senderra;

b. Casey Miller, former BioPlus Program Manager, who resigned effective May 1, 2026, to work at Senderra;

c. Rachael Hoover, former BioPlus "Director I Sales, Carelon" who resigned effective May 8, 2026, to work at Senderra;

d. Eric Mitchell, former "340B Contract Executive Sr." at BioPlus, who resigned effective June 16, 2026, to work at Senderra; and

e. Justin Bonewit, former BioPlus Implementation Coordinator Lead who resigned effective June 26, 2026, to work at Senderra.

35. The clustering of these departures—all from the same team, all reporting to the same manager, all joining the same competitor— is no coincidence. Upon information and belief, Ormond orchestrated and facilitated the solicitation and departure of the Solicited Employees on behalf of Senderra, in direct violation of his employee non-solicitation covenant and his fiduciary duties to Elevance Health.

36. To date, Eric Mitchell, Casey Miller, Rachael Hoover, Anthony Mechas, and Justin Bonewit all work at Senderra now under Ormond's supervision.

37. The mass departure of BioPlus's 340B Program leadership and operational team to Senderra has caused tremendous operational disruption, loss of revenue and institutional knowledge, and significant

harm to BioPlus's ability to maintain its prior level of operations and service its customers.

b. Elevance Health Discovers BioPlus Customers Registering to Do Business with Senderra/Ormond, *Prior* to Ormond's Resignation.

38. In June 2026, as Elevance Health learned of the fourth BioPlus employee's impending resignation, it began an investigation into whether Ormond was involved in the *en masse* departures.

39. As part of this investigation, Elevance Health searched Ormond's name in the HRSA's Office of Pharmacy Affairs Information System ("OPAIS")[1] database. The results were shocking.

40. The OPAIS database showed that between April 1-15, 2026, a series of BioPlus customers—at least 13 of them—had filed 340B initial registrations to name Senderra as their 340B contract representative. These represented some of BioPlus's most valuable customer relationships.

[1] OPAIS is a federal public database that is used to track and verify participants in the 340B Drug Pricing Program. It provides information on contract pharmacies, covered entities, and manufactures. Contracting details, such as dates of registration between covered entities and contract pharmacies are publicly available at https://340bopais.hrsa.gov/.

41. These registrations are completed by the customers (which are hospitals) and other "covered entities" as required by 340B program requirements.

42. Even more shocking, one of those Senderra registrations explicitly identified Ormond as the Senderra representative.

43. In other words, in early April 2026, while Ormond was still employed at BioPlus, a series of existing BioPlus 340B's most valuable customers suddenly registered to do business with Senderra—apparently for the first time *ever*—only days before Ormond went to work at Senderra. And in the OPAIS registration, one of these BioPlus customers ("Customer B")[2] explicitly identified Ormond, *by name*, as the Senderra representative with whom they were seeking to do business.

44. Ormond, while an active BioPlus employee and the head of the entire BioPlus division, had surreptitiously solicited an untold number of BioPlus's customers to join him at Senderra. Based upon the

[2] Plaintiffs have omitted the names of the specific contract pharmacy and Elevance customer identified in the OPAIS registration out of an abundance of caution and in recognition of the confidential nature of those third-party business relationships. The full registration details are available and can be provided to the Court upon request or as otherwise required.

OPAIS registration, at least 13 of them had agreed to do so as of April 2026.

45. Ormond's conduct was in flagrant breach of his contractual and fiduciary duties to Elevance Health.

46. Upon information and belief, Senderra had knowledge of, induced, condoned, encouraged, benefitted, and continues to benefit from Ormond's unlawful conduct described herein.

47. New registrations in OPAIS are subject to a waiting period. Thus, the April 2026 OPAIS registration positioned Senderra to "go live" with BioPlus customers effective July 1, 2026, thereby directly diverting 340B revenue that would otherwise have gone to Elevance Health.

48. None of these BioPlus customers were known to have had a prior 340B relationship with Senderra. Indeed, the fact that these BioPlus customers had to file the initial registration in OPAIS to identify Senderra as their contract pharmacy representative, and undergo the regulatory waiting period, demonstrates that they did *not* have a prior 340B relationship with Senderra.

49. Upon information and belief, Ormond was working with Senderra to help solicit Elevance Health customers to Senderra at least

several months before April 15, 2026. All while still serving as the Director of BioPlus's 340B Program.

50. Following this discovery, Elevance Health made direct outreach to many of its clients who confirmed that Ormond had solicited their business for Senderra during a period of time in which he was employed by Elevance Health.

c. Elevance Health Discovers Mitchell's Dual Employment with Senderra and His Exfiltration of Elevance Health Confidential Information.

51. Contemporaneous with the beginning of Elevance Health's investigation into the *en masse* resignations at BioPlus, on June 9, 2026, BioPlus's Director of 340B Contract Sales, Todd Weber—who took over after Ormond's resignation—received an email from a vendor who asked him if Mitchell was no longer at BioPlus but was instead now working at Senderra. The vendor stated:

> Hi Todd – just got an email from Senderra and Eric's name was in the thread.
>
> I know you said he was out on paternity leave, did he leave Bioplus?

52. Mitchell was still an active BioPlus employee at the time, although he had taken paternity leave since May 1, 2026.

53. Moreover, in June 2026, Elevance Health became aware of a public registration list for the upcoming 340B Coalition Summer Conference in Washington D.C. that is scheduled to be held in July.

54. Representatives from contract pharmacies, such as Elevance Health and Senderra, routinely attend this conference, and attending representatives register for the conference several weeks before the conference is scheduled to be held.

55. The 340B Coalition Summer Conference registration list revealed that, on June 3, 2026, Senderra registered three of its employees to attend the conference – Derek Ormond, Eric Mitchell, and Casey Miller.

56. On June 12, 2026, Mitchell provided his resignation notice to Elevance Health. In his resignation notice, Mitchell informed Elevance Health that his final day with the Company would be June 18, 2026.

57. Mitchell had been holding dual positions of employment with both Senderra and Elevance Health, since at least May 2026, if not sooner. Upon information and belief, this occurred with Senderra's full knowledge and encouragement so that Senderra could access Elevance

Health's Confidential Information and Trade Secrets that Mitchell had access to during his employment.

58. Beyond his breach of fiduciary duty to Elevance Health by accepting employment with Senderra while still serving as an Elevance Health employee, Mitchell also exfiltrated and misappropriated Elevance Health's Confidential Information and trade secrets.

59. Following Mitchell's departure, Elevance Health conducted an audit of his corporate email account. That audit revealed that, while still employed by Elevance Health, Mitchell had, on multiple occasions, sent emails containing Elevance Health's Confidential Information and Trade Secrets to his personal email address. The exfiltrated data included customer lists, customer registration data, and other proprietary 340B Program information.

60. The transmission of such information to Mitchell's personal email address served no discernible work-related purpose and is consistent only with an intent to misappropriate that information for use outside of Elevance Health. It was in gross violation of Elevance Health's policies and procedures for IT usage and the safeguarding of confidential information.

61. Mitchell sent himself this information for the purpose of utilizing that information at Senderra, and with the knowledge of Senderra.

62. As such, Mitchell's misappropriation of Elevance Health's trade secrets and confidential information was done for the benefit of Senderra, directly enabling Senderra to compete unfairly against Elevance Health using Elevance Health's own proprietary data.

**E. Elevance Health Confirms Specific Instances of Customer Solicitation and Begins to Lose Business to Senderra.**

63. Elevance Health recently learned that on the evening of March 22, 2026, Ormond was seen taking a flight from Atlanta, Georgia, to San Antonio, Texas.

64. Customer A is based in San Antonio, Texas, and is one of BioPlus's most important clients.

65. During this trip, Ormond did not visit the BioPlus employees located at Customer A's hospital campus. Ormond had taken PTO from Elevance Health from March 23-24, 2026. Ormond is not known to have any personal connections to San Antonio.

66. Upon information and belief, Ormond visited Customer A, while still a BioPlus employee, in order to solicit Customer A to do business with Senderra.

67. Weeks later, Customer A filed an OPAIS registration to do 340B business with Senderra for the first time ever. Upon information and belief, Customer A's decision to engage Senderra was caused by Defendants' flagrant violation of Elevance Health's legal rights.

68. Senderra commenced competing for this Customer A's 340B business effective July 1, 2026. Since that time, Elevance Health has been to see a drop in prescription referrals from this client and expects this trend to continue. Upon information and belief, the drop in prescription referrals was caused by Customer A diverting business to Senderra.

69. Customer B: Ormond solicited this active Elevance Health customer to switch to Senderra while he was still employed at Elevance Health. A review of the April OPAIS registration reveals that, on April 13, 2026, Senderra was approved to contract with Customer B. As of July 1, 2026, Senderra can actively conduct business with this customer.

70. Elevance Health subsequently spoke with Customer B's CEO who confirmed that Ormond had solicited his company's 340B business on behalf of Senderra.

71. Customer C: In May 2026, Elevance Health experienced a precipitous and unexplained decline in revenue from Customer C, a longstanding covered entity customer whose relationship was managed directly by Ormond during his tenure at Elevance Health. Ormond had access to detailed confidential and proprietary information regarding Customer C's business, needs, and relationship with Elevance Health. Upon his departure to Senderra, Ormond was uniquely positioned to, and upon information and belief did, exploit that confidential information to solicit Customer C for Senderra's benefit.

72. Elevance Health's investigation of Defendants' scheme is ongoing, and Elevance Health expects to identify additional diverted customers and additional instances of misconduct upon the commencement of discovery.

**F. Ormond's Stock Grants and Restrictive Covenant Agreements.**

73. Ormond's senior position at BioPlus was also reflected in his substantial compensation. As of December 2025, Ormond earned a base

annualized salary of over $155,000. He also received a substantial amount of equity compensation in addition to his base salary. Between March 2023 and March 2026, Elevance Health granted Ormond 275 shares of exercisable non-qualified stock options through four separate equity grants. During that same period, Elevance Health separately granted Ormond 146 shares of restricted stock units and 1,019 shares of performance stock units through eleven grants.

74. In the past three years, Elevance Health's stock (NYSE: ELV) has traded between $300 and $500 per share, meaning that the gross value of Ormond's stock grants and options ranged between $191,000 and $324,000.[3]

75. On March 14, 2025, Elevance Health awarded Ormond with a series of restricted stock units, performance stock units, and stock options (collectively, the "Stock Grants"), which were conditioned upon Ormond's acceptance of an attached Restricted Stock Unit Award Agreement, Non-Qualified Stock Option Award Agreement, and a Performance Stock Unit Award Agreement (collectively the

[3] These figures reflect the overall value of the stock grants and options. The among of net income received by Ormond from the sale of exercised stock options would depend on the option price and the market value at the time of sale.

"Agreements"), copies of which are attached hereto as Exhibits A, B, and C.

76. The Agreements were provided as part of Elevance Health's 2017 Elevance Health Incentive Compensation Plan (the "Plan"), and each Agreement incorporated the Plan by reference in full. See Ex. A, § 13; Ex. B, § 14; Ex. C, § 14. A copy of the Plan is attached as Exhibit D.

77. The Plan provided that the Plan and all award agreements, including the Agreements at issue in this lawsuit, are governed under Indiana law except as superseded by federal law, as noted below:

> The Plan and All Award Agreements and other agreements… shall be construed in accordance with and governed by the laws of the state of Indiana, without giving effect to the choice of law principles thereof, except to the extent superseded by applicable United States federal law.

Ex. B, § 20.11.

78. In exchange for Ormond's acceptance of the Stock Grants, Elevance Health requested that Ormond agree to certain reasonably defined restrictions on unfair competition, which are set forth in Section 7(b) of the Agreement, titled "Non-Competition." In relevant part, Ormond agreed that for a period of 12 months after the cessation of his employment with Elevance Health, he would refrain from: (1) obtaining

a "Competitive Position" in the "Restricted Territory" for a "Competitor" or (2) performing a "Restricted Activity" in the "Restricted Territory" for a "Competitor," according to the definitions given those terms in the Agreement. Ex. A, § 7(b); Ex. B, § 7(b); Ex. C, § 7(b).

79. "Competitive Position" is defined in the Agreements to mean the following:

> any employment or performance of services with a Competitor (A) the same as or similar to the services that Participant performed for the Company in the last twenty-four (24) months of Participant's employment with Company (the "Look Back Period"), or (B) in the performance of which Participant will likely use any Confidential Information of the Company.

Ex. A, at § 7(b)(i).

80. "Restricted Activity" is defined in the Agreements to mean "any activity for which [Ormond] had responsibility for the Company," or about which Ormond had Elevance Health's confidential information within the "Look Back Period" (i.e., the 24-month period prior to the cessation of his employment). Ex. A, §§ 7(b)(i), (iii).

81. "Restricted Territory" is defined in the Agreements to mean:

> any geographic area in which the Company does business and which [Ormond] provided services in, had responsibility for, had a material presence or influence in, or had access to

> Confidential Information about, such business, within the Look Back Period.

*Id.* at § 7(b)(ii).

82. Here, the geographic scope of Ormond's "Restricted Territory" encompassing the areas in which he performed services, held responsibility, or had access to Confidential Information during the Look Back Period, extended across all fifty U.S. states.

83. "Competitor" is defined in the Agreements to mean, in pertinent part:

> any entity or individual (other than the Company) engaged in any one or more of the following: . . . the provision, delivery, or administration of health benefit plans or health care services such as pharmacy benefits management (including Specialty pharmacy), . . . or any other aspects of the business or products or services offered by the Company, as to which Participant had responsibilities or received Confidential Information about, during the Look Back Period.

*Id.* at § 7(b)(iv).

84. Ormond agreed that the restrictions in § 7(b) are reasonable and necessary to protect Elevance Health's legitimate business interests. Ex. A, § 9(a); Ex. B, § 9(a); Ex. C, § 9(a). These legitimate business interests include Elevance Health's interest in protecting its goodwill, and the unfair competition that would result from the use of its customer

relationships, confidential information and trade secrets to which Ormond had expansive access in his high-ranking position.

85. Elevance Health's "Confidential Information" includes, but is not limited to, trade secrets, customer lists, confidential business practices, profit margins, pricing information, business and marketing plans, ideas, and strategies, and confidential financial performance and projects. Ex. A, § 7(a)(i).

86. On March 14, 2025, Ormond accepted his Stock Grants—thereby also accepting the Agreements and the terms and conditions set forth therein—via an electronic signature. Acceptance of the Stock Grants was voluntary and not a condition of employment. Id. at 2.

87. As early as May 14, 2026, Ormond began employment with Senderra as Vice President of 340B Strategies. Senderra is a specialty pharmacy that offers pharmacy benefits management and specialty pharmacy services, which compete directly with Elevance Health's BioPlus specialty pharmacy division.

88. Senderra's specialty pharmacy operations and 340B drug pricing program services compete directly with BioPlus's specialty pharmacy and pharmacy benefits management offerings, targeting the

same demographic of customers in many of the same geographic areas in which BioPlus operates.

89. Upon information and belief, Ormond's employment with Senderra is in Trinity, Florida; however, Ormond is providing services for Senderra in numerous other states, including Florida, Texas, and Virginia.

90. Ormond's employment with Senderra is both (i) a Competitive Position within the Restricted Territory for a Competitor; and (ii) a Restricted Activity within the Restricted Territory for a Competitor, and thus constitutes independent material breaches of § 7(b) of the Agreement.

91. First, Ormond's work for Senderra is a "Competitive Position" because it is a position of employment with a Competitor where he performs the "same or similar services" to what Ormond performed for Elevance Health's BioPlus division in the last 24 months prior to his departure. See Ex. A, § 7(b)(i)(A).

92. Second, Ormond's work for Senderra is also a "Competitive Position" for the independent reason that it is a position of employment with a Competitor where Ormond is likely to use Elevance

Health's Confidential Information. See Ex. A, § 7(b)(i)(B). In his role at Elevance Health, Ormond had access to Elevance Health's confidential pricing data, specialty pharmacy strategies, customer and supplier information, and other trade secrets directly relevant to his new role as Vice President of 340B Strategies for Senderra.

93. Moreover, by serving as Vice President of 340B Strategies for Senderra, Ormond is engaging in a Restricted Activity because he is engaging in activities for which he "had responsibility for [Elevance Health]" and "about which [he] had Confidential Information within the Look Back Period." See Ex. A, § 7(b)(iii). Specifically, Ormond's responsibility for specialty pharmacy operations and pharmacy benefits management at BioPlus during the Look Back Period directly corresponds to the services he is currently performing for Senderra.

94. Ormond's performance of the Competitive Position and of the Restricted Activity are both occurring within the Restricted Territory, which encompasses the geographic areas in which Ormond provided services, had responsibility for, had a material presence or influence in, or had access to Confidential Information about, during the Look Back Period. See Ex. A, § 7(b)(ii).

95. Senderra and its affiliates operate in, and offer specialty pharmacy and 340B services in, the geographic areas that fell within Ormond's responsibility during his Look Back Period at Elevance Health's BioPlus division.

96. Senderra is a "Competitor," as defined by the Agreement. It is a company engaged in the provision, delivery, and administration of health care services, specifically pharmacy benefits management (including specialty pharmacy). See Ex. A, § 7(b)(iv). Senderra's specialty pharmacy operations and 340B drug pricing program services compete directly with Elevance Health's BioPlus specialty pharmacy and pharmacy benefits management services.

97. Senderra competes with Elevance Health in other ways as well.

98. Senderra is also a "Competitor" under the Agreements because it is an entity engaged in the provision of "products or services" offered by Elevance Health as to which Ormond "had responsibilities or received Confidential Information" during the final 24 months of his employment at Elevance Health. In the final 24 months of his employment, Ormond had responsibilities for BioPlus's specialty

pharmacy operations and obtained Confidential Information with respect to the operation thereof, including Elevance Health's confidential pricing data, supplier and formulary strategies, customer contracts, and 340B program strategies.

99. Without limitation, Elevance Health disclosed its Confidential Information to Ormond, including its strategies for managing specialty drug costs, specialty pharmacy network configuration, and the pricing and contracting methodologies applied to BioPlus specialty pharmacy customers and health plan clients.

100. As discussed above, Ormond is in breach of the Agreements by performing activities that are the same as or substantially similar to, and competitive with, the services he provided to Elevance Health during the Look Back Period.

101. As a result of Ormond's conduct, Elevance Health is suffering and will continue to suffer significant monetary harm in an amount to be proven at trial.

102. Absent injunctive relief, Elevance Health will suffer further irreparable harm based on Ormond's activities, as described above.

103. In addition to the non-competition restrictions set forth in § 7(b), the Agreements impose separate and independent non-solicitation obligations on Ormond in §§ 7(c) and 7(d).

104. Section 7(c) of the Agreements prohibits Ormond, during any period in which he is employed by the Company and during the Restriction Period following the end of his employment, from directly or through the direction or control of others, for a Competitor of Elevance Health: (i) soliciting business from any client, account, or medical care provider of the Company that Ormond had contact with, participated in contact with, had or shared responsibility for, or had access to Confidential Information about, during the Look Back Period; or (ii) soliciting business from any client, account, or medical care provider that the Company pursued, and Ormond had contact with, responsibility for, or knowledge of Confidential Information about, by reason of his employment with the Company, during the Look Back Period.

105. With respect to employees, § 7(d) of the Agreements prohibits Ormond, during any period in which he is employed by the Company and during the Restriction Period following the end of his employment, from directly or indirectly soliciting, hiring, attempting to solicit or hire, or

participating in any attempt to solicit or hire, for any non-Company entity: "any … employee of the Company whom Ormond knows to have access to or possession of Confidential Information that would give an unfair advantage to a Competitor[,]" or "any … employee of the Company to whom Ormond reported, or who reported to Ormond, on or at any time during the six (6) months immediately preceding the date of such solicitation or hire[.]" See Id. at §§7(d)(i), (iii).

106. Ormond agreed that the restrictions contained in §§ 7(c) and 7(d) are reasonable and necessary to preserve the legitimate business interests of Elevance Health, its present and potential business activities, and the economic benefits derived therefrom.

107. Ormond further agreed that if he commits or threatens to commit a breach of any covenant contained in Section 7, including Sections 7(c) and 7(d), Elevance Health shall have the right to seek and obtain all appropriate injunctive and other equitable remedies, without posting bond therefor, except as required by law, in addition to any other rights and remedies that may be available at law or under the Agreements. Id. at § 9(b).

108. Ormond further agreed that any such breach would cause irreparable injury to Elevance Health and that money damages would not provide an adequate remedy. Id.

109. Ormond violated § 7(c) of the Agreements, and did so before his employment with Elevance Health had even ended, by soliciting business from Elevance Health clients, accounts, and medical care providers that he had contact with, participated in contact with, had or shared responsibility for, or had access to Confidential Information about, during the Look Back Period, for the benefit of Senderra, a Competitor.

110. Ormond also violated § 7(d) of the Agreements by directly or indirectly soliciting, hiring, attempting to solicit or hire, and participating in any attempt to solicit or hire Elevance Health employees for Senderra, a non-Company entity, beginning while he was still employed by Elevance Health and continuing after his departure.

111. Specifically, Ormond violated § 7(d) of the Agreements by and through soliciting the following individuals to work at Senderra (collectively the "Solicited Employees"):

a. Anthony Mechas, former BioPlus "Business Information Analyst, Sr." who resigned effective April 24, 2026, to work at Senderra;

b. Casey Miller, former BioPlus Program Manager, who resigned effective May 1, 2026, to work at Senderra;

c. Rachael Hoover, former BioPlus "Director I Sales, Carelon" who resigned effective May 8, 2026, to work at Senderra;

d. Eric Mitchell, former "340B Contract Executive Sr." at BioPlus, who resigned effective June 16, 2026, to work at Senderra; and

e. Justin Bonewit, former BioPlus Implementation Coordinator Lead who resigned effective June 26, 2026, to work at Senderra.

112. Each of the Solicited Employees reported to Ormond during his tenure at BioPlus, and/or each possessed Elevance Health Confidential Information that would give an unfair advantage to a Competitor. See Ex. A, § 7(d)(i), (iii).

113. When Senderra induced Ormond to engage in the breaches of the foregoing provisions of the Agreements, including §§7(b), (c), and (d),

it knew or acted in reckless disregard of the existence of the foregoing restrictive covenants, which are intended to protect Elevance Health's legitimate business interests.

114. Indeed, in 2023, when Senderra hired two prior Elevance Health employees in violation of their restrictive covenant agreements, Elevance Health sent cease and desist letters to Senderra, explicitly warning Senderra of the former employees' post-employment restrictive covenants and demanding that Senderra refrain from interference with Elevance Health's contractual rights. Senderra has clearly disregarded this warning.

### G. Elevance Health Quickly Acts to Protect Its Rights, But Continuing Loss of Business Compels It to File Suit.

115. Elevance Health first became aware of the gravity of Defendants' unlawful conduct in late June 2026.

116. On June 26, 2026, Elevance Health promptly issued cease and desist letters to Ormond, Senderra. Mitchell's cease & desist was sent on July 2, 2026.

117. The parties subsequently engaged in discussions of resolving this dispute. In order to induce Plaintiffs not to seek immediate injunctive relief, Defendants averred that they would not raise any

argument that Plaintiffs slept on their rights during the time spent in settlement discussions.

118. However, on August 26, 2026, a representative of Customer A instructed BioPlus to cancel prescriptions for Tyenne Auto Injectors so that the prescriptions could be rerouted to Senderra. Customer A's representative further disclosed that Senderra had reserved a large inventory of Tyenne Auto Injectors specifically for Customer A. This discovery, combined with learning of a marked decline in July 2026 prescription referrals, caused Elevance Health to realize that it could not wait any longer to protect itself from imminent, irreparable harm posed by Defendants' unlawful conduct.

119. As a direct and proximate result of Defendants' actions, Plaintiffs have suffered and continue to suffer significant losses in customer revenue and business relationships.

**COUNT I**
**Breach of Contract (Against Ormond)**

120. Elevance Health incorporates the allegations of the foregoing paragraphs above as though fully set forth herein.

121. The Agreements are a valid and enforceable contract between Elevance Health and Ormond under Indiana law.

122. Elevance Health and Ormond exchanged adequate and sufficient consideration in connection with the Agreement.

123. The restrictions in § 7(b) are valid, reasonable and enforceable under Indiana law.

124. Elevance Health duly performed its obligations under the Agreement.

125. Ormond is in material breach of § 7(b) by obtaining a Competitive Position for a Competitor in the Restricted Territory within the 12-month Restriction Period, for the reasons set forth above.

126. Ormond is also in material breach of § 7(b) of the Agreements for the independent reason that, within the 12-month Restriction Period, he has performed and is performing a Restricted Activity in the Restricted Territory for a Competitor, for the reasons set forth above.

127. Ormond is also in material breach of § 7(c) of the Agreements due to his solicitation of Elevance Health customers during his employment and in the Restriction Period.

128. Ormond is also in material breach of § 7(d) of the agreements due to his solicitation of Elevance Health employees, as restricted in the Agreements, during his employment and in the Restriction Period.

129. Because of Ormond's material breach, Elevance Health is suffering and shall continue to suffer significant monetary harm and irreparable damages for which there is no adequate remedy at law.

130. Elevance Health is entitled to injunctive relief as a result of Ormond's continuing breaches, for which Ormond has agreed that Elevance Health need not post a bond. *See* Ex. A § 9(a)-(b).

131. Under § 9(e) of the Agreement, Elevance Health is entitled to the recovery of its reasonable attorneys' fees and expenses, including not only costs of courts, but also expert fees, travel expenses, and other expenses incurred, upon the Court's determination that Elevance Health is the prevailing party.

132. Pursuant to Section 8 of each Agreement, Elevance Health is also entitled to the return of all consideration paid to Ormond under the Agreements within the 24 months preceding his breach, including the fair market value of all vested RSUs and PSUs, in the total amount of $24,612.37, plus any additional amounts to be determined.

**COUNT II**
**Breach of Fiduciary Duty (Against Ormond)**

133. Elevance Health incorporates the allegations of the foregoing paragraphs above as though fully set forth herein.

134. Ormond and Mitchell occupied positions of trust and confidence within Elevance Health, had access to Confidential Information, and owed fiduciary duties to Elevance Health, including duties of loyalty, care, and good faith.

135. Ormond and Mitchell breached their fiduciary duties to Elevance Health for the reasons described above, including by breaching the duty of loyalty by and through competing against Elevance Health while active employees.

136. Mitchell breached his fiduciary duty to Elevance Health by misappropriating Confidential Information and Trade Secrets for the benefit of Senderra.

137. Ormond further breached his fiduciary duty by soliciting employees to leave Elevance Health to go and work at Senderra, thereby precipitating an *en masse* resignation, and by falsely misrepresenting to Elevance Health, on multiple occasions, that he was not departing to join a competitor, thereby concealing his breach and preventing Elevance Health from taking timely action to protect its interests.

138. Each of the foregoing acts constitutes a willful and intentional breach of Ormond's fiduciary duties to Elevance Health, undertaken with

actual knowledge of their wrongfulness and with the intent to benefit Senderra at Elevance Health's expense.

139. As a direct and proximate result of Ormond's and Mitchell's respective breaches of their fiduciary duties, Elevance Health has suffered significant monetary losses, including but not limited to: lost profits from the diversion of at least thirteen covered entity customers to Senderra, loss of personnel and institutional knowledge resulting from the *en masse* resignations in the BioPlus 340B Program team; and the costs of investigating and remediating Defendants' scheme.

140. Elevance Health is also entitled to disgorgement of each of Ormond's and Mitchell's compensation earned during the periods of their respective disloyalty, and disgorgement of any profits derived by Ormond, Mitchell, and Senderra from their breaches.

141. Because Ormond's and Mitchell's conduct was intentional and undertaken with actual knowledge of its wrongfulness and the substantial certainty of harm to Elevance Health, Elevance Health is entitled to punitive damages against each of Ormond and Mitchell pursuant to Fla. Stat. Ann. § 768.72, in an amount not to exceed the greater of three times the compensatory damages awarded or $500,000,

or, if the fact finder determines that their conduct was motivated solely by unreasonable financial gain and that the unreasonably dangerous nature of such conduct was actually known to the managing agent, director, officer, or other person responsible for making policy decisions on behalf of the defendant, in an amount not to exceed four times the compensatory damages or $2,000,000.

142. Additionally, to the extent the fact finder determines that Ormond and/or Mitchell had a specific intent to harm Elevance Health and that their conduct did in fact cause such harm, there shall be no cap on punitive damages.

**COUNT III**
**Breach of Fiduciary Duty (Against Mitchell)**

143. Elevance Health incorporates the allegations of the foregoing paragraphs above as though fully set forth herein.

144. Plaintiffs plead this Count in the alternative under Federal Rule of Civil Procedure 8(d)(2)–(3), to the extent Ohio law governs Mitchell's duties or conduct, without waiving or limiting any claim under other applicable law.

145. Under Ohio common law, Mitchell and Elevance Health had a fiduciary relationship because Mitchell was entrusted with

responsibility for BioPlus's customer relationships and with Elevance Health's Confidential Information and Trade Secrets, and was required to act primarily for Elevance Health's benefit. Mitchell therefore owed Elevance Health duties of loyalty, good faith, care, and confidentiality.

146. Mitchell breached those duties by maintaining dual employment with Senderra, a direct competitor, while still employed by Elevance Health; by placing Senderra's interests ahead of Elevance Health's in connection with Elevance Health's customer relationships; and by transmitting Elevance Health's customer lists, customer registration data, and other proprietary 340B Program information to his personal email address without authorization or a legitimate work-related purpose.

147. Mitchell's transmission and related conduct were undertaken for the purpose of using Elevance Health's information at Senderra and with knowledge that the conduct would benefit Senderra at Elevance Health's expense, as alleged above.

148. Mitchell's conduct was calculated, disloyal, and in bad faith, and constituted a breach of the fiduciary duties he owed to Elevance Health under Ohio law.

149. As a direct and proximate result of Mitchell's breaches, Elevance Health has suffered and continues to suffer damages, including lost customer revenue, loss of the competitive value of its proprietary 340B Program information, and the costs of investigating and remediating the misconduct

150. Elevance Health is entitled to actual damages and, to the extent permitted by Ohio law, equitable relief, restitution or disgorgement of benefits attributable to Mitchell's disloyal conduct, faithless servant damages, and punitive damages, together with all other available relief.

## COUNT IV
## Aiding and Abetting Breach of Fiduciary Duty (Against Senderra)

151. Elevance Health incorporates the allegations of the foregoing paragraphs above as though fully set forth herein.

152. As set forth above, Ormond and Mitchell owed and breached fiduciary duties to Elevance Health.

153. Senderra had actual knowledge of Ormond's and Mitchell's fiduciary duties to Elevance Health. Despite this knowledge, Senderra

actively recruited and hired Ormond and Mitchell while they were still employed by Elevance Health, with full knowledge of their obligations.

154. Upon information and belief, Senderra substantially assisted and encouraged Ormond's and Mitchell's breach of their fiduciary duties by: (a) recruiting and hiring Ormond and Mitchell while they were still Elevance Health employees; (b) directing or facilitating Ormond's registration as Senderra's Contract Pharmacy Representative in OPAIS while he remained employed by Elevance Health; (c) using Ormond's insider access and relationships and Mitchell's misappropriated Confidential Information and trade secrets to solicit Elevance Health customers to switch their 340B business to Senderra; (d) facilitating and benefiting from the coordinated departure of multiple additional Elevance Health employees recruited by Ormond; and (e) registering, through or with the assistance of Ormond, as a new contract pharmacy for at least thirteen Elevance Health covered entity customers, using confidential information to which Ormond had access by virtue of his position.

155. As a direct and proximate result of Senderra's aiding and abetting of Ormond's and Mitchell's breach of fiduciary duty, Elevance

Health has suffered the same damages set forth in Count II, for which Senderra is jointly and severally liable.

156. Because Senderra's conduct was intentional and undertaken with actual knowledge of Ormond's and Mitchell's fiduciary obligations and breach thereof, Elevance Health is entitled to punitive damages against Senderra pursuant to Fla. Stat. Ann. § 768.72.

## COUNT V
## Tortious Interference with Contract (Against Senderra)

157. Elevance Health incorporates the allegations of the foregoing paragraphs above as though fully set forth herein.

158. The Agreements constitute valid and enforceable contracts between Elevance Health and Ormond, as set forth above.

159. Senderra had knowledge of the Agreements and the restrictive covenants contained therein.

160. Senderra intentionally and without justification interfered with the Agreements by: recruiting and hiring Ormond to serve as its Vice President of 340B Strategies in direct violation of his non-compete obligations; directing or facilitating Ormond's customer solicitation activities while he was still employed by Elevance Health; facilitating the breach of Ormond's non-solicitation obligations by recruiting and

employing his former subordinates in violation of § 7(d) of the Agreements; and otherwise encouraging Ormond to disregard his contractual obligations to Elevance Health.

161. Senderra is a third party to the Agreements and had no privilege or justification for its interference.

162. As a direct and proximate result of Senderra's tortious interference with the Agreements, Elevance Health has suffered actual damages including lost customer revenue, lost 340B program business, and lost personnel—all of which are direct and ascertainable consequences of the breach Senderra induced.

163. Because Senderra's conduct was intentional and egregious, Elevance Health is entitled to punitive damages pursuant to Fla. Stat. Ann. § 768.72.

**COUNT VI**
**Tortious Interference with Business Relationships (Against Ormond and Senderra)**

164. Elevance Health incorporates the allegations of the foregoing paragraphs above as though fully set forth herein.

165. Elevance Health maintained established, ongoing, and commercially valuable business relationships with its covered entity

customers in the 340B Program, including Customer A, Customer B, Customer C, Customer D, and at least thirteen additional covered entities identified through OPAIS records. These relationships were developed over the course of several years through direct, personal engagement by Elevance Health employees, including Ormond and Mitchell.

166. Defendants had actual knowledge of these business relationships. Ormond personally managed Elevance Health's relationships with these customers, and Mitchell, in his capacity as National Contracts Executive, also had direct access to and responsibility for customer relationship information.

167. Defendants intentionally and without justification interfered with these business relationships by: soliciting Elevance Health's covered entity customers to switch their 340B contract pharmacy relationships to Senderra while Ormond and Mitchell were still employed by Elevance Health; registering Senderra as a new contract pharmacy for at least thirteen Elevance Health customers in April 2026 using Elevance Health's confidential customer and relationship data; and using

misappropriated confidential information to facilitate the diversion of Elevance Health's customer base to Senderra.

168. Defendants' interference was not limited to contracted relationships. Defendants also interfered with Elevance Health's prospective business relationships -- including with customers it was actively pursuing -- through the use of its confidential customer targeting and pipeline information to which Ormond and Mitchell had access during the Look Back Period.

169. As a direct and proximate result of Defendants' tortious interference with Elevance Health's business relationships, Elevance Health has suffered significant damages, including the loss of revenue from at least thirteen covered entity customers, and the ongoing risk of further customer losses as additional OPAIS registrations from Senderra go live.

170. Because Defendants' conduct was intentional and undertaken with actual knowledge of the harm it would cause to Elevance Health, Elevance Health is entitled to punitive damages pursuant to Fla. Stat. Ann. § 768.72.

## COUNT VII
## Tortious Interference with Business Relationships (Against Mitchell)

171. Elevance Health incorporates the allegations of the foregoing paragraphs above as though fully set forth herein.

172. Plaintiffs plead this Count in the alternative under Federal Rule of Civil Procedure 8(d)(2)–(3), to the extent Ohio law governs Mitchell's conduct, without waiving or limiting any claim under other applicable law.

173. Elevance Health maintained established, ongoing, and commercially valuable business relationships with covered entity customers in its 340B Program, including Customer A, Customer B, Customer C, Customer D, and at least thirteen additional covered entities identified through OPAIS records. Elevance Health also maintained prospective business relationships with customers it was actively pursuing.

174. Mitchell knew of these relationships because, as a National Contracts Executive, he established strategic partnerships, maintained customer relationships, conducted sales, and had access to customer lists, customer registration data, and other customer relationship information.

175. Mitchell intentionally and without justification interfered with those relationships by maintaining concurrent employment with Senderra while still employed by Elevance Health, transmitting Elevance Health's customer and registration information to his personal email for use at Senderra, and using or facilitating the use of that information and his customer-related access to target and divert Elevance Health's customers to Senderra.

176. This interference was improper and unjustified because it was accomplished through disloyal conduct, misuse of entrusted confidential information, and conduct undertaken to benefit a direct competitor, rather than through fair competition.

177. As a direct and proximate result of Mitchell's tortious interference, Elevance Health has suffered and continues to suffer damages, including lost customer revenue, lost 340B Program business, and the ongoing risk of further customer losses.

178. Elevance Health is entitled to actual damages and, to the extent permitted by Ohio law, equitable and injunctive relief to prevent continued interference, together with punitive damages, and all other available relief.

**COUNT VIII**
**Deceptive and Unfair Trade Practices Under the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201-501.213 (Against Ormond, Mitchell and Senderra)**

179. Elevance Health incorporates the allegations of the foregoing paragraphs above as though fully set forth herein.

180. Elevance Health participates in the 340B business described above, and Senderra is a direct competitor of Elevance Health in that market.

181. The challenged conduct occurred in trade or commerce because it involved the solicitation, registration, and diversion of commercial 340B customer relationships and the provision of competing specialty pharmacy and pharmacy benefits management services.

182. Senderra, Ormond, and Mitchell engaged in unfair methods of competition and deceptive or unfair acts or practices in violation of Fla. Stat § 501.204(1), including by: (a) Ormond's solicitation of Elevance Health customers for Senderra while he was still employed by Elevance Health; (b) Ormond's and Mitchell's simultaneous employment by Senderra while they were still employed by Elevance Health; (c) Mitchell's transmission of Elevance Health's Confidential Information and Trade Secrets to his personal email address for use at Senderra; (d)

Senderra's knowing recruitment, hiring, direction, and encouragement of Ormond and Mitchell and its use of their access, relationships, and information to target and divert customers away from Elevance Health and toward Senderra; and (e) Senderra orchestrating the departure of Elevance Health employees to Senderra, and aiding and encouraging Ormond in breaching his Agreements with Elevance Health, all of which resulted in Senderra gaining an unfair competitive advantage against Elevance Health.

183. These acts were directed at Elevance Health's commercial relationships and competitive position in the 340B market. Defendants' use of entrusted information, coordinated customer solicitation, the breach and inducement to breach lawful agreement, and diversion of business was unethical, unscrupulous, and contrary to the policy of protecting fair competition, and has caused substantial injury that Elevance Health could not reasonably avoid.

184. Ormond's representations that he was not leaving Elevance Health to work for a competitor, made while he was carrying out the conduct described above, further concealed Defendants' scheme and delayed Elevance Health's ability to protect its customer relationships.

Those representations and the related conduct were deceptive or unfair acts in trade or commerce within the meaning of FDUTPA.

185. As a direct and proximate result of Defendants' deceptive or unfair acts and practices, Elevance Health has suffered actual damages, including the direct loss of 340B customer business and the resulting lost customer revenue or profits from customers diverted to Senderra, including Customer A, Customer C, and other covered entities identified through OPAIS. The amount of those actual damages will be proven at trial.

186. Because Defendants' conduct is ongoing and threatens further diversion of 340B business, Elevance Health is entitled under Fla. Stat. § 501.211(1) to a declaratory judgment and temporary, preliminary, and permanent injunctive relief enjoining Defendants from continuing the deceptive or unfair acts and practices alleged herein, including using Confidential Information or Trade Secrets to solicit or divert their 340B customers.

187. Under Fla. Stat. § 501.2105, Elevance Health is entitled to recover their reasonable attorneys' fees and costs.

## COUNT IX
## Misappropriation of Trade Secrets Under the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq*. (Against Mitchell)

188. Elevance Health's confidential and proprietary information, including its 340B Program customer lists, customer registration data, contract terms, pricing structures, discount methodologies, business development strategies, and covered entity relationship information, constitutes "trade secrets" within the meaning of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1839(3).

189. Elevance Health's trade secrets relate to products and services used in, or intended for use in, interstate or foreign commerce. Specifically, CarelonRx's 340B Program serves covered entity customers located throughout the United States, and the trade secrets at issue directly support that nationwide commercial operation.

190. Elevance Health took reasonable measures to maintain the secrecy of its trade secrets, including by: (a) requiring employees, including Mitchell, to execute confidentiality and non-disclosure agreements as a condition of accessing sensitive business information; (b) restricting access to confidential data on a need-to-know basis; (c) maintaining secure electronic systems for the storage and transmission

of proprietary information; and (d) implementing company policies prohibiting the unauthorized disclosure or transmission of confidential information.

191. The trade secrets at issue derive independent economic value from not being generally known to, or readily ascertainable by, other persons or entities who could obtain economic value from their disclosure or use -- including, specifically, Senderra, a direct competitor of Elevance Health in the 340B contract pharmacy market.

192. Mitchell had access to Elevance Health's trade secrets by virtue of his position as a National Contracts Executive on CarelonRx's 340B Program team, which required him to work directly with and have access to customer lists, customer registration data, and other proprietary 340B Program information in the course of his day-to-day responsibilities.

193. Mitchell misappropriated Elevance Health's trade secrets within the meaning of 18 U.S.C. § 1839(5) by acquiring and disclosing those trade secrets through improper means. This includes by transmitting emails containing Elevance Health's confidential and proprietary information, including customer lists, customer registration

data, and other proprietary 340B Program information, from his Elevance Health company email account to his personal email address without authorization and without any legitimate work-related purpose.

194. Mitchell's transmission of Elevance Health's trade secrets to his personal email account was accomplished while he was simultaneously employed by Senderra, a direct competitor of Elevance Health, and was done for the purpose of utilizing that information at Senderra.

195. Mitchell knew, or had reason to know, that his acquisition and disclosure of Elevance Health's trade secrets was improper, as he was subject to confidentiality obligations arising from his employment with Elevance Health, and as no legitimate business purpose justified the transmission of such sensitive information to a personal email account.

196. Senderra benefited from Mitchell's misappropriation by using Elevance Health's confidential customer information to target, solicit, and register Elevance Health's covered entity customers as new Senderra contract pharmacy clients, thereby directly diverting 340B revenue from Elevance Health.

197. As a direct and proximate result of Mitchell's misappropriation of its trade secrets, Elevance Health has suffered actual damages, including but not limited to: lost customer revenue resulting from the diversion of covered entity customers to Senderra; the loss of the competitive value of its proprietary 340B Program information; and the costs of investigating and remediating Mitchell's misappropriation.

198. Because Mitchell's misappropriation was willful and malicious -- undertaken with actual knowledge of its wrongfulness, in violation of his duties to Elevance Health, and for the purpose of unjustly benefiting Senderra at Elevance Health's expense -- Elevance Health is entitled to an award of exemplary damages in an amount not exceeding two times the amount of actual damages, pursuant to 18 U.S.C. § 1836(b)(3)(C).

199. Because Mitchell's misappropriation was willful and malicious, Elevance Health is also entitled to an award of reasonable attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D).

200. Elevance Health is further entitled to injunctive relief pursuant to 18 U.S.C. § 1836(b)(3)(A), enjoining Mitchell from using,

disclosing, or benefiting from any Elevance Health trade secret in his possession, and requiring the return and/or destruction of all misappropriated information.

**COUNT X**
**Misappropriation of Trade Secrets Under the Ohio Uniform Trade Secrets Act, Ohio Rev. Code § 1333.61 *et seq.***
**(Against Mitchell)**

201. Elevance Health incorporates the allegations of the foregoing paragraphs above as though fully set forth herein. Plaintiffs plead this Count in the alternative under Federal Rule of Civil Procedure 8(d)(2)–(3), to the extent Ohio law governs Mitchell's conduct, without waiving or limiting any claim under other applicable law.

202. Elevance Health's confidential and proprietary information -- including its 340B Program customer lists, customer registration data, contract terms, pricing structures, discount methodologies, business development strategies, and covered entity relationship information -- constitutes "trade secrets" within the meaning of the Ohio Uniform Trade Secrets Act ("OUTSA"), Ohio Rev. Code § 1333.61(D).

203. Elevance Health took reasonable efforts under the circumstances to protect the secrecy of its trade secrets, as required by Ohio Rev. Code § 1333.61(D)(2), including by restricting access to

confidential information on a need-to-know basis, requiring employees to comply with confidentiality obligations, maintaining secure electronic systems for the storage and transmission of proprietary data, and implementing policies prohibiting the unauthorized use or disclosure of confidential business information.

204. Elevance Health's trade secrets derive independent economic value from not being generally known or readily ascertainable by third parties who could obtain economic value from their disclosure or use, including Senderra and other competitors in the 340B contract pharmacy market.

205. Mitchell had access to Elevance Health's trade secrets solely by virtue of his employment as a National Contracts Executive on CarelonRx's 340B Program team.

206. Mitchell misappropriated Elevance Health's trade secrets within the meaning of Ohio. Rev. Code § 1333.61(B) by disclosing and using those trade secrets without Elevance Health’s express or implied consent, after acquiring knowledge of them under circumstances giving rise to a duty to maintain their secrecy or limit their use. This included transmitting emails containing Elevance Health's confidential customer

lists, customer registration data, and other proprietary 340B Program information from his Elevance Health company email account to his personal email address without authorization, without any legitimate work-related purpose, and with the intent to use that information for the benefit of Senderra.

207. Mitchell's misappropriation constituted improper means within the meaning of the OUTSA, as it involved a breach of his duty to maintain secrecy and arose directly from his intentional exploitation of access that was entrusted to him solely for the benefit of Elevance Health.

208. At the time of his misappropriation, Mitchell knew or had reason to know that the information he transmitted was Elevance Health's trade secret, that his knowledge of it was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, and that his conduct violated his confidentiality obligations and was not authorized.

209. Mitchell used and intended to use Elevance Health's misappropriated trade secrets without Elevance Health’s express or implied consent and for the benefit of Senderra, enabling Senderra to solicit and register Elevance Health's covered entity customers and

unfairly compete against Elevance Health using Elevance Health's own proprietary data.

210. As a direct and proximate result of Mitchell's misappropriation of Elevance Health's trade secrets under the OUTSA, Elevance Health has suffered actual damages including lost revenue from the diversion of covered entity customers, the loss of the competitive value of its confidential 340B Program information, and costs associated with investigating and remediating the misappropriation.

211. Elevance Health is entitled to injunctive relief pursuant to Ohio Rev. Code § 1333.62, enjoining Mitchell from any further use or disclosure of Elevance Health's trade secrets.

212. Because Mitchell's misappropriation was willful and malicious, Elevance Health is entitled to an award of exemplary damages in an amount not exceeding three times the actual damages awarded, pursuant to Ohio Rev. Code § 1333.63(B).

213. Because Mitchell's misappropriation was willful and malicious, Elevance Health is further entitled to an award of reasonable attorneys' fees pursuant to Ohio Rev. Code § 1333.64.

## COUNT XI
## Fraud/Fraudulent Misrepresentation (Against Ormond)

214. Elevance Health incorporates the allegations of the foregoing paragraphs above as though fully set forth herein.

215. On February 19, 2026, and on multiple occasions thereafter, Ormond made affirmative and material misrepresentations to Elevance Health -- specifically to his direct supervisor, Chief Industry and Trade Relations Officer Mike Moyano, and others -- that he was not departing Elevance Health to work for a competitor.

216. Ormond's representations were false. At the time he made them, Ormond had already commenced his relationship with Senderra and was actively taking steps in furtherance of his employment with Senderra, including soliciting Elevance Health customers for Senderra's benefit and registering as Senderra's Contract Pharmacy Representative in OPAIS.

217. Ormond knew his representations were false at the time he made them.

218. Ormond made these misrepresentations with the intent to induce Elevance Health to forbear from taking action to protect its business interests -- including by seeking injunctive relief, terminating

Ormond for cause, restricting his access to confidential information and customer relationships, or taking steps to prevent the diversion of its customers and employees to Senderra.

219. Elevance Health justifiably and reasonably relied on Ormond's representations, given his position as a senior director and fiduciary of the Company, and refrained from taking protective action during the period in which Ormond continued to exploit his position to benefit Senderra.

220. As a direct and proximate result of Elevance Health's reliance on Ormond's misrepresentations, Elevance Health suffered actual injury, including: the loss of at least thirteen covered entity customers to Senderra; significant and ongoing revenue losses; and the loss of its 340B Program leadership team -- all of which Elevance Health could have prevented, or significantly mitigated, had it known the truth of Ormond's concurrent employment with Senderra

221. Because proof of Ormond's fraudulent misrepresentations necessarily establishes intentional misconduct, Elevance Health is entitled to punitive damages pursuant to Fla. Stat. Ann. § 768.72, with no cap where the fact finder determines that Ormond specifically

intended to harm Elevance Health and that his conduct did in fact cause such harm.

**COUNT XII**
**Civil Conspiracy (Against All Defendants)**

222. Elevance Health incorporates the allegations of the foregoing paragraphs above as though fully set forth herein.

223. Senderra, Ormond, and Mitchell entered into an express or implied agreement to accomplish an unlawful objective: namely, to misappropriate Elevance Health's confidential information and trade secrets, systematically divert its customer base, poach its employees, and destroy its 340B Program -- all for the purpose of enriching Senderra at Elevance Health's expense.

224. The agreement among Defendants is evidenced by, among other things: (a) the coordinated and simultaneous nature of Ormond's and Mitchell's dual employment with Elevance Health and Senderra; (b) the mass departure of Ormond's entire direct-report team to the same competitor within weeks of one another; (c) Mitchell's exfiltration of Elevance Health's confidential customer data immediately prior to his departure, for use at Senderra; (d) the registration of Senderra as a new contract pharmacy for at least thirteen Elevance Health customers in a

single registration period, timed precisely to coincide with Ormond's departure; and (e) Senderra's registration of three of its employees -- Ormond, Mitchell, and Miller -- to attend a 340B industry conference on June 3, 2026, when Mitchell was still an active Elevance Health employee.

225. In furtherance of the conspiracy, Defendants committed the following overt tortious acts:

a. Ormond solicited Elevance Health customers to Senderra while still employed by Elevance Health;

b. Ormond registered as Senderra's Contract Pharmacy Representative in OPAIS while still employed by Elevance Health;

c. Ormond orchestrated the mass departure of his 340B Program team to Senderra;

d. Mitchell exfiltrated Elevance Health's confidential customer lists, registration data, and proprietary 340B Program information from his company email account and transmitted it to his personal email address for use at Senderra; and

e. Senderra recruited, hired, and directed Ormond and Mitchell in the above activities with actual knowledge of their obligations to Elevance Health.

226. Each of these acts constitutes an underlying tort, including breach of fiduciary duty, aiding and abetting breach of fiduciary duty, tortious interference with contract, tortious interference with business relationships, fraud, and misappropriation of trade secrets.

227. As a result of Defendants' civil conspiracy, Elevance Health has suffered all of the damages set forth in the preceding counts, for which all Defendants are jointly and severally liable.

228. Because the underlying torts involved intentional misconduct, Elevance Health is entitled to punitive damages against all Defendants pursuant to Fla. Stat. Ann. § 768.72.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in its favor and against Defendants as follows:

A. A temporary restraining order, preliminary, and permanent injunction enjoining Ormond, for the remainder of the Restriction Period (tolled for the period of violation), from obtaining a Competitive Position or performing a Restricted Activity in the Restricted Territory for Senderra or any other Competitor, as those terms are defined in the Agreements;

B. Enjoining Ormond from soliciting, directly or indirectly, any Elevance Health customer with whom he had contact, responsibility, or access to Confidential Information during the Look Back Period;

C. Enjoining Ormond from soliciting or hiring any Elevance Health employee, as restricted by the Agreements, in violation of his non-solicitation obligations;

D. Enjoining Mitchell and Senderra from using, disclosing, or benefiting from any Elevance Health Confidential Information and Trade Secrets misappropriated from Elevance Health's systems;

E. Enjoining Senderra from employing Ormond or Mitchell in any capacity that violates their respective obligations to Elevance Health; and

F. Requiring Defendants to return all Elevance Health Confidential Information and trade secrets in their possession, custody, or control;

G. Compensatory damages in an amount to be proven at trial, including all lost profits, lost customer revenue, and other economic harm caused by Defendants' conduct;

H. Disgorgement of Ormond's and Mitchell's compensation earned during the period of their disloyalty, and disgorgement of all profits derived by Defendants from their unlawful conduct;

I. Return of Ormond's consideration in the total amount of $24,612.37, as demanded in Elevance Health's July 3, 2026 letter, plus any additional amounts due under Section 8 of the Agreements;

J. Punitive damages in the maximum amount permitted by applicable law, including exemplary damages under Ohio Rev. Code § 1333.63(B) with respect to Mitchell's misappropriation of trade secrets and, to the extent applicable to the remaining claims under Fla. Stat. Ann. § 768.73;

K. Attorneys' fees and expenses pursuant to Section 9(e) of the Agreements and applicable law;

L. Pre- and post-judgment interest at the maximum rate permitted by law; and

M. Such other and further relief as this Court deems just and proper.

**A JURY TRIAL IS DEMANDED ON ALL ISSUES SO TRIABLE.**

Dated: September 4, 2026

*/s/ Dale A. Evans, Jr.*
Dale A. Evans, Jr.
Florida Bar No. 98496
dale.evans@troutman.com
**TROUTMAN PEPPER LOCKE LLP**
777 S. Flagler Drive, Suite 215-E
West Palm Beach, FL 33401
Telephone: (561) 833-7700
Facsimile:(561) 655-8719

Andrew J. Henson, *pro hac vice forthcoming*
VSB No. 95622
**TROUTMAN PEPPER LOCKE LLP**
1001 Haxall Point
Richmond, VA 23219
Telephone: (804) 697-1200
Facsimile: (804) 697-1339
andrew.henson@troutman.com

*Counsel for Plaintiffs*

# VERIFICATION

I, Michael Moyano, am an authorized representative of Elevance Health, Inc., and being duly sworn under oath, do hereby declare under penalty of perjury that I have read the foregoing Verified Complaint, and that the statements set forth herein are true as I believe based on my personal knowledge and information supplied to me by Elevance Health's employees and agents and through records kept by Elevance Health in the ordinary course of business.

Date: September 3, 2026.

By ____________________
Michael Moyano
VP Chief Industry and Trade Relations Officer
Elevance Health, Inc.